**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FANNY ROGERS,** | ) |
| *Plaintiff*, | ) |
| v. | ) Case No. _____ |
| **BANK OF AMERICA, N.A.,**<br>100 N. Tryon Street<br>Charlotte, NC 28255 , | ) |
| Serve: | ) |
| David G. Leitch, Esq.,<br>Office of the General Counsel<br>BANK OF AMERICA, N.A.<br>100 N. Tryon Street<br>Charlotte, NC 28255, | ) |
| *Defendant*. | ) |

**CIVIL COMPLAINT FOR EQUITABLE**
**AND MONETARY RELIEF AND DEMAND FOR JURY**

Plaintiff Fanny Rogers brings this suit against Defendant Bank of America for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII") and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*. ("ADA").

**JURISDICTION AND VENUE**

1. This Court has personal jurisdiction over Defendant because Defendant transacts regular business and has regular contacts in the District of Columbia.

2. This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is an action arising under the laws of United States, specifically Title VII and ADA.

3. Venue is proper in this Court under 28 U.S.C. § 1391 because it is the judicial district where the unlawful employment actions occurred, and it is the location of Rogers' employment.

## PARTIES

4. Rogers is a resident of Maryland, and she worked at Defendant from in or about October 2000 through on or about April 17, 2017.

5. Defendant is a national banking association headquartered in Charlotte, North Carolina, with offices and branches in Washington, District of Columbia.  Defendant's number of employees is unknown, but exceeds fifty employees.

## ADMINISTRATIVE EXHAUSTION

6. Rogers timely filed a charge of discrimination against Defendant with the United States Equal Employment Opportunity Commission ("EEOC"), and the EEOC issued a Notice of Suit Rights on September 19, 2018.

## FACTUAL ALLEGATIONS

7. Rogers is Hispanic and originally from Colombia. She is deaf in her left ear.

8. Because Rogers is deaf in her left ear, she can have difficulty hearing in noisy environments.

9. Rogers began working at Defendant as a part-time teller in or about October 2000. Defendant subsequently promoted Rogers several times, including to full-time teller, sales and service specialist, customer banker, and senior customer banker.  In or around February 2016, Defendant changed the title of senior customer bankers to relationship managers, including Rogers' title.

10. As a relationship manager, Rogers was responsible for opening accounts, servicing accounts, following up with customers, customer service and assisting customers in the branch, and identifying customers' needs. The relationship manager position is a sales position, which has sales quotas.

11. Since in or about 2005, Rogers worked at Defendant's branch located in the District of Columbia at 2001 Pennsylvania Avenue, NW. The 2001 Pennsylvania Avenue, NW, branch is located on a corner and can be noisy due to its location, traffic, and volume of customers.

12. During Rogers' employment, she disclosed to management, coworkers, and customers that she is deaf and has difficulty hearing and requested accommodations such as moving to a quieter branch such as the State Department branch, which is located in a basement and has no windows; moving desk locations within the branch to be further away from the lobby entrance and teller desk to minimize noise; headsets or other assistive listening aids; and to be transferred to a different position.

13. In or around May 2016, market sales manager Robert Scott became Rogers' direct supervisor, and in or around November 2015, Shelia Blue became the branch manager or financial center manager. Blue's supervisor is operations/market manager Barry James.

14. Deandra Washington is the assistant branch or assistant financial center manager, and Datasha Hallman is a relationship manager who began working at the branch in or around 2016. Scott, Blue, James, Washington, and Hallman are African American.

15. In 2016, Rogers asked Blue to move to a desk further away from the lobby entrance due to the noise associated with individuals walking in and out of the bank, individuals being greeted as they walked in, and other background noise. Blue denied Rogers' request.

16. In or around 2016, Hallman began making fun of and mocking Rogers' disability. Hallman would openly pretend to be deaf by not responding to questions and make comments saying "I'm deaf" and "it's this ear not that ear." When Hallman would make fun of and mock Rogers' disability, Blue and Washington would laugh. Hallman would also complain that it was unfair Rogers did not have to do her job because of her disability.

17. After Scott became Rogers' direct supervisor in or around May 2016, Rogers requested several time that Scott provide her with reasonable accommodations for her hearing issues, but Scott did not respond.

18. In or around 2016, the relationship managers' job duties were changed to require that they make fifty phone calls to customers per day and build a book of business. Before this change, sales phone calls were required just once a week on Monday's from 5pm to 6:30pm, although these requirements were never enforced by management. Under the previous arrangement, Rogers minimized making phone calls to the extent she could due to her hearing. Prior to the job duties change in 2016, she typically did not make phone calls, and explained to her managers and coworkers why she did not answer the phones or make phone calls.

19. On or about June 13, 2016, Rogers realized the main lock on the vault had not been locked the night before and a check had been left overnight in the teller drawer unlocked. Rogers would not sign the log book for the vault when Blue asked her to because it was left unlocked. When Rogers asked Blue what happened, Blue became angry. Rogers complained to human resources about Blue. In particular, Rogers told human resources that Blue and Washington carelessly mishandled of sensitive client data, exposing it to potential identity theft.

20. Rather than being upset over this and similar episodes of mishandling of critical client information by Blue and Washington, the managers, James and Scott, were upset with

Rogers for reporting the security breach.

21. Shortly thereafter, on or about June 15, 2016, Blue verbally counseled Rogers about leaving a temporary debt card on her desk while she went to get a document from the printer next to her desk.

22. On or about July 19, 2016, pursuant to protocol, Rogers gave a document to Blue and Blue then tore up the document. On or about July 26, 2016, Blue falsely verbally counseled Rogers for leaving a document in the printer. The document Blue accused Rogers of leaving in the printer was the document Rogers gave to Blue a week prior. When Blue showed Rogers the document, it was taped together. Rogers told Blue that she was wrong, was harassing Rogers, and was violating the law. Rogers then complained to human resources.

23. Shortly after July 26, 2016, Rogers met with James, Scott, and Blue. Scott told Rogers during the meeting that Rogers did not respect management and that "today, when you leave the office you have two choices: be smart and think about what we said to you today or you can go back to your desk and submit another complaint to HR." Rogers complained to human resources.

24. Hallman had not been meeting her sales numbers and falsely complained that Rogers was taking away customers from Hallman.

25. In or around June or July 2016, Blue and Washington began referring Rogers' customers to Hallman regardless of Rogers' availability, regardless of whether the customers requested to see Rogers or had an appointment scheduled with Rogers.

26. Rogers was the only employee in the branch who spoke fluent Spanish. As a result, Rogers typically worked with the customers whose preferred language was Spanish.

27. During the summer of 2016, Blue began telling Rogers to speak in English even

when Rogers was speaking with customers who had limited English or who preferred Spanish.

28. When Rogers told Blue that Blue cannot tell her to not speak with customers in Spanish who speak Spanish, Blue questioned whether the customers asked Rogers to speak to them in Spanish and told Rogers it is rude to talk in a language that not everyone understands.

29. On or about August 3, 2016, Rogers emailed Scott and copying other executives explaining she has a disability, which makes it difficult to have conversations on the phone and sit behind the tellers due to background noise. Rogers asked for accommodations to ensure that she can continue to be a successful employee given the changes to her duties requiring a minimum of fifty calls per day, which she was having difficulty performing due to her disability.

30. In response, in August 2016 Defendant assigned Vice President of Human Resources Accommodations Danielle Oxford to assist Rogers with accommodations. Rogers discussed her disability and need for accommodations with Oxford.

31. Rogers explained that relationship managers spend an hour assisting the tellers with referrals to shadow the tellers and help them identify other services the client may need by standing behind the teller desk and listening to the customer through the glass. It is very noisy behind the teller desk.

32. Rogers reported that when assisting the tellers, Rogers was having difficulty hearing both the teller and the customer due to the noise and thus needed an accommodation, Oxford told her to talk to Scott. When Rogers spoke to Scott, he told Rogers that she only needed to hear the teller side of the conversation. Rogers continued to raise concerns about how she needed an accommodation for her partial deafness and that she could not adequately assist the tellers while only hearing one side of the conversation.

33. In or around October 2016, Defendant told Rogers she did not have to assist the tellers behind the teller desk anymore. However, when Rogers asked Scott to modify her sales numbers to reflect that she would be receiving fewer referrals from tellers and ensure the accommodation did not negatively impact her ability to meet her sales numbers, Scott refused and told Rogers he could not adjust her sales numbers.

34. Rogers also asked Oxford what other jobs are available to deaf employees and asked whether she should transition into a different role that was less customer facing and did not require making a high volume of phone calls. Oxford told Rogers that Defendant could not just give her a different job, but if Rogers applied for open positions and let Oxford know then Oxford would see what could be done.

35. Rogers applied for open positions she was qualified for and informed Oxford of her applications as she applied. Rogers is unaware of any actions taken by Oxford to assist Rogers in seeking another job internally as an accommodation. Rogers was not interviewed or selected for any of the positions she applied for.

36. In the summer of 2016, Blue turned on the television in the lobby area above Rogers' desk after Rogers complained to human resources about Blue. Rogers repeatedly asked Blue and Scott to turn off the television or turn down the volume because the noise was impacting her ability to hear and do her job. Blue and Scott refused to turn off the television or to down the volume. They told Rogers the television was part of a new program and was going to be kept on.

37. After Rogers talked to Oxford about the television, the volume was turned down slightly, but it was still impacting Rogers' ability to hear and to do her job due to the loud volume.

38. After approximately a month, the television was turned off after a customer complained about the loud volume.

39. In August 2016, Defendant issued Rogers a headset (Platonics Encore Pro HW510), but it did not work properly. Defendant issued Rogers a replacement headset after she contacted Oxford. Shortly after Rogers began using the headset she began to experience dizziness, neck pain, and ear pain due to the volume.

40. On or about August 12, 2016, Rogers provided Defendant a letter from her physician that detailed her disability and in part recommended a custom ear mold be configured to Rogers' existing or a new compatible listening device for Rodgers' phone use at work.

41. Defendant issued Rogers another headset (Tristar H81N), which shortly thereafter stopped working properly. Moreover customers told Rogers while speaking to her on the phone that they could not hear her or it sounded like Rogers had her phone on speaker phone and was sitting very far from the phone. Accordingly Rogers informed Oxford that the Tristar H81N headset was not working properly, but Oxford stopped responding to Rogers.

42. In or around October or November 2016, Rogers repeatedly emailed and called Oxford about the issues with her headset and her need for accommodations that worked but Oxford stopped responding to Rogers entirely.

43. From October or November 2016 through Rogers' termination on April 17, 2017, Defendant's agents stopped discussing and responding to Rodgers' requests for accommodations. Moreover, Defendant never provided Rogers with a custom ear mold or a headset or other listening device designed for an individual with hearing impairments.

44. Washington, Hallman, and/or Blue encouraged customers to complain about Rogers even when they knew the complaints were false.

45.     In or around January 2017, Defendant's Internal Investigations Group, Corporate Audit Investigations Group, and/or Employee Relations Group began an investigation into complaints about Rogers, including false allegations by Washington, Hallman, and/or Blue.

46.     In or around early April 2017, construction began in the branch, and Rogers requested to transfer branch locations, including to the State Department because of the construction noise, which was negatively impacting her ability to hear and to do her job.

47.     In or around April 13, 2017, Washington refused to allow Rogers assist a customer who made an appointment with Rogers. Washington came very close to Rogers and made Rogers feel uncomfortable, as if Washington was trying to start a fight with her. Rogers complained to Blue and Scott about what happened, but neither did anything. Rogers complained to James who told Rogers that Washington would never act that way and that he believed Washington.

48.     On or about April 13, 2017, Rogers attended a branch meeting where there was a loud construction related noise during the meeting that employees commented on.  Rogers again requested to be transferred due to the ongoing renovations.  Scott told Rogers "we do not transfer problems, we terminate them."

49.     On or about April 17, 2017, Scott told Rogers that Defendant was terminating her employment because Rogers changed a social security number to get sales credit and opened a credit card without customer consent.

50.     Rogers did not change a social security number to get sales credit or open a credit card without customer consent.  Rogers made an inadvertent error when entering a customer's social security number, which is a common mistake that employees often make. Rogers only opened credit cards with customer consent.

51.     As the result of Defendant's illegal discrimination and retaliation, Rogers has sustained economic damages and mental anguish and will continue to sustain these damages into the future.

## COUNT I
## ADA
## 42 U.S.C. § 12101, *et seq.*
## Disability Discrimination

52.     Rogers incorporates the allegations in the foregoing paragraphs as though alleged herein.

53.     Rogers was an "employee" as defined in 42 U.S.C. § 12111(4).

54.     Defendant was an "employer as defined in 2 U.S.C. § 12111(5).

55.     Rogers is deaf in her left ear, and thus, Rogers has a "disability" as defined in 42 U.S.C. § 12102(1).

56.     Rogers' disability limits the major life activities of hearing and working.

57.     At all relevant times, Defendant had knowledge of Rogers' disability.

58.     Rogers is a qualified individual with a disability who can perform the essential functions of her job with or without reasonable accommodations under 2 U.S.C. § 12111 and 29 C.F.R. § 1630.2(m).

59.     Defendant discriminated against Rogers because of her disability.

60.     Defendant's stated and forthcoming reasons are pretextual for unlawful discrimination.

61.     Rogers has suffered damages as a result of Defendant's unlawful acts.

## COUNT II
## ADA
## 42 U.S.C. § 12101, *et seq.*
## Failure to Accommodate

62. Rogers incorporates the allegations in the foregoing paragraphs as though alleged herein.

63. Rogers was an "employee" as defined in 42 U.S.C. § 12111(4).

64. Defendant was an "employer as defined in 2 U.S.C. § 12111(5).

65. Rogers is deaf in her left ear, and thus, Rogers has a "disability" as defined in 42 U.S.C. § 12102(1).

66. Rogers' disability limits the major life activities of hearing and working.

67. At all relevant times, Defendant had knowledge of Rogers' disability.

68. Rogers is a qualified individual with a disability who can perform the essential functions of her job with or without reasonable accommodations under 2 U.S.C. § 12111 and 29 C.F.R. § 1630.2(m).

69. Rogers repeatedly requested reasonable accommodations, including headsets or other assistive hearing devices, transferring to a quieter branch, moving to a quieter desk location, adjusting sales goals, and transferring to a different position.

70. Defendant denied Rogers reasonable accommodations and failed to engage in the interactive process.

71. To the extend Defendant did provide Rogers with reasonable accommodations, the accommodations provided were inadequate, such as the headsets provided in 2016.

72. Rogers has suffered damages as a result of Defendant's unlawful acts.

## COUNT III
### Title VII
### 42 U.S.C. § 2000e, *et seq.*
### Race Discrimination

73. Rogers incorporates the allegations in the foregoing paragraphs as though alleged herein.

74. Rogers was an "employee" as defined in 42 U.S.C. § 2000e(f).

75. Defendant was an "employer as defined in 42 U.S.C. § 2000e(b).

76. Rogers is Hispanic, and therefore, Rogers is a member of a protected class.

77. Defendant discriminated against Rogers because of her race.

78. Defendant's stated and forthcoming reasons are pretextual for unlawful discrimination.

79. Rogers has suffered damages as a result of Defendant's unlawful acts.

## COUNT IV
### Title VII
### 42 U.S.C. § 2000e, *et seq.*
### National Origin Discrimination

80. Rogers incorporates the allegations in the foregoing paragraphs as though alleged herein.

81. Rogers was an "employee" as defined in 42 U.S.C. § 2000e(f).

82. Defendant was an "employer as defined in 42 U.S.C. § 2000e(b).

83. Rogers was born in Colombia and is a member of a protected class based on national origin, and Defendant discriminated against her because of her national origin.

84. Defendant's stated and forthcoming reasons are pretextual for unlawful discrimination.

85. Rogers has suffered damages as a result of Defendant's unlawful acts.

## COUNT V
### Title VII
### 42 U.S.C. § 2000e, *et seq.*
### Retaliation

86. Rogers incorporates the allegations in the foregoing paragraphs as though alleged herein.

87. Rogers was an "employee" as defined in 42 U.S.C. § 2000e(f).

88. Defendant was an "employer as defined in 42 U.S.C. § 2000e(b).

89. Rogers engaged in protected activity when she told Blue that Blue could not tell Rogers that Rogers could not speak Spanish.

90. Defendant retaliated against Rogers for engaging in protected activity.

91. Defendant's stated and forthcoming reasons are pretextual.

92. Rogers has suffered damages as a result of Defendant's unlawful acts.

## COUNT VI
### ADA
### 42 U.S.C. § 12101, *et seq.*
### Retaliation

93. Rogers incorporates the allegations in the foregoing paragraphs as though alleged herein.

94. Rogers was an "employee" as defined in 42 U.S.C. § 12111(4).

95. Defendant was an "employer as defined in 2 U.S.C. § 12111(5).

96. Rogers is deaf in her left ear, and thus, Rogers has a "disability" as defined in 42 U.S.C. § 12102(1).

97. Rogers engaged in protected activity when she requested reasonable accommodations for her disability.

98. After Rogers requested reasonable accommodations, Scott, Blue, Washington, and Hallman treating Rogers differently.  They became hostile and critical towards Rogers, directed clients away from Rogers, and they made fun of her disability.

99. On April 13, 2017, when Rogers requested to be moved to a different branch as an accommodation, Scott said "we don't transfer problems, we terminate them."

100. On April 17, 2017, four days after Rogers requested to be moved to a different branch, Defendant terminated Roger's employment.

101. Defendant retaliated against Rogers for engaging in protected activity.

102. Defendant's stated and forthcoming reasons are pretextual.

103. Rogers has suffered damages as a result of Defendant's unlawful acts.

## PRAYER FOR RELIEF

Based on the foregoing, Rogers respectfully requests that she be awarded the following relief:

a. Judgment against Defendant in an amount of any wages, salary, employment benefits, or other compensation denied or lost to Rogers, including economic damages, liquidated damages, compensatory and punitive damages to be determined at trial;

b. Re-employment, reinstatement, promotion, front pay, or other equitable relief;

c. Pre-judgment interest;

d. Interest due on unpaid wages;

e. A reasonable attorney's fee and costs of this litigation;

f. Reasonable expert witness fees; and

g. Any other relief that this Honorable Court deems just and proper to award.

## JURY DEMAND

Plaintiff demands a jury for all issues proper to be so tried.

>Respectfully submitted,
>
>/s/ Nicholas Woodfield
>R. Scott Oswald, DC Bar 418859
>Nicholas Woodfield, DC Bar 471801
>The Employment Law Group, P.C.
>888 17th Street, N.W., Suite 900
>Washington, D.C. 20006
>(202) 261-2812 (telephone)
>(202) 261-2835 (facsimile)
>soswald@employmentlawgroup.com
>nwoodfield@employmentlawgroup.com
>*Counsel for Plaintiff*